Filed 7/11/13 (see last page of opn. for appx. referred to on p. 7)
**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| LATINOS UNIDOS DEL VALLE DE NAPA Y SOLANO et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF NAPA, <br><br>     Defendant and Respondent. | A135094 <br><br> (Napa County <br> Super. Ct. No. 26-50568) |

Latinos Unidos Del Valle de Napa y Solano (Latinos Unidos)[1] and individual plaintiffs Hector Olvera, Antonio Manzo, and Gabriel Deharo appeal from a judgment entered in favor of defendant County of Napa (the county) on their petition for a writ of mandate. Plaintiffs contend that the court erred in rejecting their contentions that (1) the county's 2009 housing element does not substantially comply with the state Housing Element Law (Gov. Code,[2] § 65580 et seq.); (2) the county's density bonus ordinance conflicts with the state Density Bonus Law (§ 65915); and (3) the county's zoning ordinances discriminate against affordable housing and lower income persons in violation of section 65008 and against Latinos and people with disabilities in violation of the federal Fair Housing Act (42 U.S.C. § 3601 et seq.), the state Fair Employment and Housing Act (§ 12900 et seq.) and section 65008. Although we agree with the trial

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and III of the Discussion.

[1] Latinos Unidos is a nonprofit public benefit corporation, which advocates for "non-discriminatory development policies . . . that address the needs of all economic segments of the population" in Napa County.

[2] All statutory references are to the Government Code unless otherwise noted.

court's conclusions in most respects, in the published portion of this opinion we conclude that the county's density bonus ordinance unlawfully conflicts with the state Density Bonus Law. Accordingly, we shall reverse the judgment in that one respect and remand the matter with appropriate instructions.

**PROCEDURAL HISTORY**

Latinos Unidos commenced this action in November 2009. In July 2010, Latinos Unidos along with the individual plaintiffs filed a second amended petition for writ of mandate and complaint for declaratory and injunctive relief. Plaintiffs allege that the county's zoning scheme discriminates against low-income and very-low income persons in violation of section 65008; that the zoning scheme violates the federal Fair Housing Act, the state Fair Employment and Housing Act and section 65008 in that it discourages and interferes with the development of affordable housing, which has a disparate impact on Latinos and people with disabilities; that the county's housing element fails to comply with California's Housing Element Law; and that the county's density bonus ordinance conflicts with the state Density Bonus Law.

In May and June of 2011, the trial court conducted a hearing on plaintiffs' challenges to the county's housing element, after which the court issued an order holding that the housing element "substantially complied" with state law. The trial court then conducted a multiday hearing on plaintiffs' remaining claims and on February 1, 2012, issued a statement of decision finding in favor of the county on all other claims. Plaintiffs filed a timely notice of appeal.

**DISCUSSION**

**I.      The County's Housing Element**

A.      Summary of the Housing Element Law

Declaring housing availability to be of "vital statewide importance" and the "attainment of decent housing and a suitable living environment . . . a priority of the highest order," the Legislature enacted the Housing Element Law, which requires local governments to adopt a "housing element" as a component of its general plan. (§ 65580 et seq., added by Stats. 1980, ch. 1143, p. 3697, § 3; *Fonseca v. City of Gilroy* (2007) 148

2

Cal.App.4th 1174, 1183 (*Fonseca*).) The purpose of the Housing Element Law is, among other things, "[t]o assure . . . cities [will] recognize their responsibilities in contributing to the attainment of the state housing goal," including "housing affordable to low- and moderate-income households." (§§ 65580, subd. (c), 65581, subd. (a).)[3] A local government's housing element must be reviewed and revised every five to eight years. (§§ 65583, 65588, subds. (b), (e).)

The housing element of a general plan must contain specific components, analyses, goals and policies. (§ 65583.)[4] The housing element must include, among other things, "[a]n inventory of land suitable for residential development, including vacant sites and sites having potential for redevelopment, and an analysis of the relationship of zoning and public facilities and services to these sites." (§ 65583, subd. (a)(3).) This inventory of land "shall be used to identify sites that can be developed for housing within the planning period and that are sufficient to provide for the jurisdiction's share of the regional housing need for all income levels."[5] (§ 65583.2, subd. (a).) The housing element must

---

[3] The state housing goal and a city or county's share is determined under section 65584, which requires the California Department of Housing and Community Development (the department) to "determine the existing and projected need for housing for each region" and for either the department or the appropriate council of governments to "adopt a final regional housing need plan that allocates a share of the regional housing need to each city, county, or city and county." (§§ 65584, subds. (a), (b), 65584.05.) Each city or county's share of the regional housing need "shall include that share of the housing need of persons at all income levels within the area significantly affected by the general plan of the city or county." (§ 65584, subd. (a)(1).) Section 65584, subdivision (e) defines very low, low, and moderate household income levels for the purpose of allocating shares of the regional housing need.

[4] The first paragraph of section 65583 provides generally: "The housing element shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, financial resources, and scheduled programs for the preservation, improvement, and development of housing. The housing element shall identify adequate sites for housing, including rental housing, factory-built housing, mobile homes, and emergency shelters, and shall make adequate provision for the existing and projected needs of all economic segments of the community."

[5] Section 65588, subdivision (f)(1) defines "planning period" as "the time period between the due date for one housing element and the due date for the next housing element."

also include "[a] statement of the community's goals, quantified objectives, and policies relative to the maintenance, preservation, improvement, and development of housing" (§ 65583, subd. (b)(1)), as well as "[a] program which sets forth a schedule of actions during the planning period, each with a timeline for implementation, . . . that the local government is undertaking or intends to undertake to implement the policies and achieve the goals and objectives of the housing element through the administration of land use and development controls, the provision of regulatory concessions and incentives, the utilization of appropriate federal and state financing and subsidy programs when available, and the utilization of moneys in a low- and moderate-income housing fund of an agency if the locality has established a redevelopment project area . . . ." (§ 65583, subd. (c).) The program "must identify a sufficient number of sites that will be made available through appropriate zoning and development standards to meet the quantified objectives for housing for all income levels. And if the program does not identify sufficient sites to satisfy the need for housing for all income levels, it must . . . identify sufficient sites to be zoned for multifamily housing for low and very low income residents." (*Fonseca, supra,* 148 Cal.App.4th at p. 1183, citing §§ 65583, subd. (c)(1), 65583.2, subd. (h).)[6]

"In creating [or revising] its housing element, the local government is required to consider the advisory guidelines adopted by the [department]. [Citation.] The locality is

---

[6] Section 65583, subdivision (c)(1) provides in relevant part that "the program shall . . . identify actions that will be taken to make sites available during the planning period with appropriate zoning and development standards and with services and facilities to accommodate that portion of the city's or county's share of the regional housing need for each income level that could not be accommodated on sites identified in the inventory completed pursuant to paragraph (3) of subdivision (a) without rezoning. . . . Where the inventory of sites, pursuant to paragraph (3) of subdivision (a), does not identify adequate sites to accommodate the need for groups of all household income levels . . . , the program shall identify sites that can be developed for housing within the planning period pursuant to subdivision (h) of section 65583.2." Sites proposed for development under section 65583.2, subdivision (h) "shall be zoned to permit owner-occupied and rental multifamily residential use by right during the planning period" with specified minimum density and development standards.

4

also required to submit draft housing elements or amendments to the department prior to adoption. [Citation.] The [d]epartment, in turn, must review drafts and make written findings as to whether the draft substantially complies with the requirements of [the housing element law]. [Citation.] The local government must then consider the [d]epartment's findings. [Citation.] If the findings reflect noncompliance in the [d]epartment's judgment, the locality must either change the draft, so that it substantially complies with [the housing element law], or adopt the draft without changes, explaining why the draft substantially complies despite the [d]epartment's findings. [Citation.] Under section 65589.3, the housing element (or its amendment) enjoys a rebuttable presumption of validity if the [d]epartment makes a finding that it substantially complies with the [statutory] requirements . . . . The statute does not provide for the converse, i.e., there is no presumption of invalidity on the basis of the [d]epartment's finding of noncompliance." (*Fonseca, supra,* 148 Cal.App.4th at pp 1183-1184.)

B.      Standard of Review

A housing element may be challenged by "any interested party" through a traditional mandamus action under Code of Civil Procedure section 1085. (§§ 65587, subds. (b), (d)(2), 65583, subd. (h).) When an interested party challenges a housing element, the trial court's review " 'shall extend to whether the housing element or portion thereof or revision thereto substantially complies with the requirements of [the housing element law].' [Citation.] ' " ' "Substantial compliance . . . means *actual* compliance in respect to the substance essential to every reasonable objective of the statute," as distinguished from 'mere technical imperfections of form." ' [Citation.]" ' [Citations.] . . . [T]he court's role in determining a mandamus challenge to a locality's housing element is simply to determine whether the locality has satisfied statutory requirements. It is not to reach the merits of the element or to interfere with the exercise of the locality's discretion in making substantive determinations and conclusions about local housing issues, needs, and concerns." (*Fonseca*, *supra*, 148 Cal.App.4th at p. 1185; see also *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 978-980; *Haro v. City of Solana Beach* (2011) 195 Cal.App.4th 542, 550.)

5

On appeal, the appellate court independently determines as a question of law whether the housing element substantially complies with the requirements of the housing element law. (*Fonseca*, *supra*, 148 Cal.App.4th at p. 1191.) In our independent review of the legal adequacy of the housing element, we afford no deference to the trial court's conclusions. (*Ibid*.) "On the other hand, a city's adoption of a housing element is a legislative enactment, something which is generally entitled to some deference. There is a presumption that the adopted element is valid and we do not in the course of our review evaluate the municipality's determination of policy. [Citation.] The burden is on the challenger to demonstrate that the housing element, and by extension the general plan, is inadequate. [Citation.] If the municipality has substantially complied with statutory requirements, we will not interfere with its legislative action, unless that action was arbitrary, capricious, or entirely lacking in evidentiary support." (*Ibid*.)

The department's interpretation of the legal effect and meaning of the housing element law is also entitled to deference. (*Fonseca*, *supra*, 148 Cal.App.4th at pp. 1193-1194 [court must "exercise our independent duty to state the meaning of the statutes at issue here, giving consideration to the [d]epartment's views"].) Any deference afforded the department's general statutory interpretation, however, does not necessarily extend to the department's specific findings—in this instance, that the county's housing element fails to substantially comply with the housing element law. "The [d]epartment's review of [a local government's] housing element differs from our judicial review. The [d]epartment reviews not only to ensure the requirements of 65583 are met, but also to make suggestions for improvements. . . . However, a court looks only to ensure the requirements of 65583 are met and not whether, in the court's judgment, the programs adopted are adequate to meet their objectives or are the programs which the court thinks ought to be there. While [a] court may be of the opinion [the local government] should adopt [the] [d]epartment's recommendations, the Legislature has stated its recommendations are advisory." (*Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.* (1985) 175 Cal.App.3d 289, 306, citing § 65585, subd. (a).)

C.    Procedural and Factual History

In January 2008, the county initiated an update to the housing element of the county's general plan, for the period through 2014. As relevant to this action, the county's 2009 updated housing element seeks to identify sites that can accommodate development of 158 housing units affordable to households with very low incomes and an additional 101 units affordable to households with low incomes, 259 total units being the number allocated to the county as its "fair share" of regional housing needs.

The county submitted a draft of its updated housing element to the department in November 2008 and in January 2009 received comments on the draft from the department. The department advised that revisions to the county's inventory and analysis were necessary to comply with the state housing element law and included an appendix detailing what it identified as deficiencies in the draft housing element. In June 2009, after making changes in its draft to address the department's comments, the county adopted its 2009 housing element.

The housing element includes an inventory of sites in the unincorporated portions of the county and indentifies 14 parcels in four areas that would be suitable for affordable housing, referred to as the "Angwin," "Moskowite Corner," "Spanish Flat" and "Napa Pipe" sites. The Napa Pipe sites sit adjacent to the City of Napa. The others are located "some distance from traditional employment centers like downtown Napa." The Spanish Flat sites are located near Lake Berryessa. The Angwin sites are located east of Highway 29 between the cities of St. Helena and Calistoga. The Moskowite Corner sites are located at the intersection of Highways 121 and 128. The location of the four sites is depicted on the diagrammatic map attached to this opinion as an appendix. Angwin, Moskowite Corner, and Spanish Flat are all within the county's "Affordable Housing Combination District" (AHCD) zoning district. [7]

---

[7] The AHCD zone was established pursuant to the terms of an agreement between Latinos Unidos and the county settling a lawsuit filed in 2003 by Latinos Unidos challenging the county's prior housing element. With approval by the county the AHCD zoning permits the development of multifamily residential housing at a greater density than permitted by the zoning that otherwise would be applicable.

7

The inventory concludes that without any rezoning Angwin can accommodate 80 housing units affordable to very low or low-income households, Moskowite Corner can accommodate 25 lower-income units, and Spanish Flat can accommodate 25 lower-income housing units.[8] The housing element includes a program to "rezone 20 acres of the Napa Pipe property to allow housing development at a minimum density of 20 dwelling units per acre" and states that once rezoned, Napa Pipe can accommodate between 152 and 202 units that can be developed by right and an additional 102 to 152 units that can be developed following approval of a use permit or development agreement.

Approximately two months after the county approved the housing element, as amended to incorporate some of the department's recommendations, the department notified the county that the housing element was not yet fully satisfactory. The department explained that while the "adopted element addresses most of the statutory requirements of housing element law," the inventory and analysis needed additional revisions in two respects, discussed below, to comply with the housing element law. The county has made no modifications to its housing element following this notification from the department.

D.     The Record

Plaintiffs contend the trial court erred by requiring them to proceed on an administrative record and excluding additional evidence that they argue would have supported their challenge to the housing element. The county argues that the trial court

_____

[8] Within the AHCD zone, some multifamily residential housing may be developed without discretionary approval by the county if the development meets underlying zoning standards for units per acre and a percentage of the housing units are set aside for affordable housing. Although greater density is permissible under the AHCD designation with a use permit, in response to the department's comments the housing element includes in its housing inventory only those units that may be developed by right. Because the housing element does not include in the inventory the number of units that might be constructed were a use permit obtained, we do not consider the county's argument on appeal that the housing element should be upheld based on the maximum density allowed by permit on the Angwin and Spanish Flat sites.

8

properly applied *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 in requiring the production of an administrative record and excluding consideration of information outside that record. [9]

This court's review of the housing element involves two issues: whether it substantially complies with the housing element law (§ 65580 et seq.) and, if it does, whether the county's approval was arbitrary, capricious, or entirely lacking in evidentiary support. (*Fonseca*, *supra*, 148 Cal.App.4th at p. 1191.) While evidence outside the administrative record may be relevant to the question of substantial compliance (see *Hernandez v. City of Encinitas* (1994) 28 Cal.App.4th 1048, 1067), the latter question turns solely on the information known to the county at the time of its decision. (*Western States Petroleum Assn. v. Superior Court, supra*, 9 Cal.4th at pp. 571, 575-576.) Thus, while the court did not err in requiring preparation of the administrative record and limiting its consideration of the latter issue to evidence included in the record, the exclusion of some extra-record evidence relevant to compliance with the housing element law was not necessarily justified. We shall address the extra-record evidence proffered by plaintiffs in connection with the issues discussed below.

E.      Analysis

Plaintiffs contend that the housing element fails to analyze correctly the suitability for residential development of the four identified sites, three of which are far removed from population centers and the fourth is part of a highly contaminated former industrial site. We first consider plaintiffs arguments regarding the Spanish Flat, Angwin and Moskowite Corner sites and then turn to their arguments regarding the Napa Pipe site and related Program H-4e.

---

[9] We have received and considered amicus curiae briefs from the California State Association of Counties and League of California Cities, and from Urban Habitat arguing, among other things, in support of and in opposition to the trial court's ruling limiting its consideration to the administrative record.

1.    The Spanish Flat, Angwin and Moskowite Corner Sites

a.    Suitability for Affordable Housing

Under section 65583.2, subdivision (c), the county is required to determine the housing capacity of the inventoried sites and determine the suitability of the sites for the development of affordable housing. Suitability for affordable housing can be determined in two ways. The county may rely on the presumption, found in section 65583.2, subdivision (c)(3)(B)(iii), that sites in suburban districts with zoning allowing densities of at least 20 units per acre are suitable for affordable housing. Or, for sites with zoning that allows less density, the county's housing element may "[p]rovide an analysis demonstrating how the adopted densities accommodate this need. The analysis shall include, but is not limited to, factors such as market demand, financial feasibility, or information based on development project experience within a zone or zones that provide housing for lower income households." (§ 65583.2, subd. (c)(3)(A).) The department's June 9, 2005 "technical assistance" memorandum elaborates, "For example, information garnered from local developers and examples of recent residential projects that currently provide housing for lower-income households may be helpful in establishing the appropriateness of the zone. Also it is recognized that cities and counties rely on subsidies to increase the affordability of residential projects. However, identifying examples of low density subsidized projects, alone, is not appropriate to demonstrate the adequacy of a zone and/or density to accommodate the projected needs of lower-income households."

Angwin, Moskowite Corners and Spanish Flat are all zoned for densities considerably lower than 20 units per acre.[10] Hence, the county was required to provide additional analysis as required by section 65583.2, subdivision (c)(3)(A). The housing element acknowledges that the density authorized by right for these three sites is lower than the default density but concludes nonetheless "that these sites will encourage and

_____

[10] The by-right zoning at the Angwin sites is 10 or 11 units per acre; at the Moskowite Corner sites, three or four units per acre; and at the Spanish Flat sites, five units per acre.

10

facilitate and are suitable for affordable housing production." In support of this conclusion, the housing element relies on the analysis in the housing needs assessment, which "explains that affordable housing has historically been built in Napa County at densities below 20 dwelling units per acre, considers issues associated with the land costs and property ownership, the availability of affordable housing fund monies, as well as the opportunities provided by the AHCD zoning for by right development of mixed-income projects, wherein market-rate units cross subsidize the development costs for affordable units." The assessment explains that due to the relatively low land values in the unincorporated portions of the county, affordable housing can be feasibly built at lower densities. Based on land costs for comparable development projects, the assessment concludes that at the lower densities applicable to the Moskowite Corner and Spanish Flats sites, the county would need to contribute $56,000 per unit to write down land costs to a level that would make development of affordable housing feasible. The assessment indicates that in a program labeled "H-2a," which is part of the housing element, the county has committed to amend its affordable housing ordinance to prioritize the use of funds to assist affordable housing development at AHCD sites and that with approximately $8 million uncommitted in the county's affordable housing fund, the county has sufficient funds to subsidize development at these two sites. The assessment concludes that the cost of land at the Angwin sites would be less than at comparable affordable housing developments so that a subsidy should not be necessary but that, even if a subsidy is required, the county would have sufficient affordable housing fund dollars available after subsidizing development at Moskowite Corner and Spanish Flats to support development at Angwin as well.

Plaintiffs contend this analysis is not sufficient. They assert that although the county recognizes that the Moskowite Corner and Spanish Flats sites require a substantial subsidy from the county to be developable as affordable housing, the county has not committed to any such subsidy. However, the county need not commit to any specific subsidy, particularly since the county has demonstrated it has sufficient funds in its affordable housing trust fund to cover projected subsidies and has proposed a program to

11

prioritize funding for these projects. (See *Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept.*, *supra*, 175 Cal.App.3d at pp. 300-301 [rejecting argument that city's statement that it "may" offer land for development lacks a firm commitment where total capacity exceeded city's housing needs for five-year period]; *Hernandez v. City of Encinitas, supra,* 28 Cal.App.4th at pp. 1068-1069, [rejecting argument that housing element lacks "meaningful assurances" on ground that overall language reflects city's intent to implement programs.)

Plaintiffs also rely on the department's assertion that, even as amended, the county's analysis fails to comply with state law. The notice sent by the department after reviewing the finalized housing element explains: "The adopted element includes information on the level of subsidy required at lower densities in the Angwin, Spanish flat and Moskowite Corner areas. However, the element does not compare this to the level of subsidy with higher densities and the analysis does not demonstrate densities that encourage the development of housing affordable to lower-income families. For example, holding a subsidy amount constant, the element does not describe how many units could be supported at higher densities compared to the proposed lower densities. It is recognized that housing affordable to lower-income households requires subsidies and financial assistance. However, for the purpose of the adequate sites analysis and the appropriateness of zoning, identifying examples of lower density subsidized housing projects or densities necessitating significantly more subsidies is not sufficient or appropriate to demonstrate the adequacy of a zone and/or density to accommodate the housing affordable to lower-income households." We disagree.

The county is under no statutory obligation to consider the effects of by-right zoning at a density greater than necessary to accommodate its fair share of regional housing needs at the identified sites. Although greater density might better encourage development of affordable housing, we are in no position to judge the effectiveness or wisdom of the county's choices. (*Buena Vista Gardens Apartments Assn. v. City of San Diego Planning Dept., supra,* 175 Cal.App.3d at p. 302 [to find that the city "might be able to adopt other and, perhaps, more effective programs would be to review the merits

12

of the program" which is "not the appellate court function"].) Moreover, the county has done more than merely identify examples of lower density subsidized housing projects. Its analysis demonstrates that subsidized housing at the identified sites is fiscally feasible. Accordingly, the county has complied with the requirements of section 65582.2, subdivision (c)(3)(A).

> b.      Infrastructure

Section 65583, subdivision (a)(3) requires the county to consider the availability of "public facilities and services" in its inventory and analysis of suitable sites for residential development. According to the department, "The element must include a general description of existing or planned water, sewer, and other dry utilities supply, including the availability and access to distribution facilities, and indicate whether public or private. A site specific analysis is not required. The element must include sufficient detail to determine whether water delivery systems and sewer treatment capacity is or will be (i.e., within the planning period) available to the identified sites. However, if parcel specific detail is available, this information could be included in the element." (Dept. of Housing and Community Development, mem., June 9, 2005.)

Here, the housing element acknowledges that the inventoried sites do not currently have water and sewer services available onsite but "assume[s] that either infrastructure will be extended to serve the sites, or new community systems will be constructed to serve the new development." Plaintiffs argue that this assumption is unsupported. We disagree.

The housing assessment conducted by the county includes an extensive analysis of the infrastructure challenges facing housing development at the identified sites and potential solutions. The assessment acknowledges that the lack of adequate water and sewer service poses major constraints to housing development and that because the county is not a provider of these services, it is dependent on cities and special districts to serve new development. With respect to the Angwin area, the assessment indicates that existing development is served through septic systems and private providers, including the Pacific Union College water and wastewater treatment system, and that the nearby

13

college is currently planning to expand its facility which, when completed, will be sufficient to service the proposed new development. The assessment acknowledges that the Spanish Flat Water District, which would serve the sites in the Spanish Flat area, is currently operating at capacity, but explains that the water district has rights to additional water from Lake Berryessa, so that extending service to the proposed sites should not be problematic. Likewise, although the sewer treatment facility would need to be expanded, distribution costs would be minimal because of the proximity of the sites to the treatment facility. With respect to the Moskowite Corner sites, the assessment states that their water needs would likely be met by the Cappell Valley Water District, which recently built a new water treatment facility. Because there is no waste water utility in that area, new development would be served by septic systems. The county's analysis reasonably supports the determination that either existing infrastructure will be extended to serve the sites, or new community systems will be constructed to serve the new development.

   c.  Environmental Considerations

Plaintiffs contend that the housing element fails to address the environmental constraints that interfere with the ability to construct affordable housing at Moskowite Corner and Spanish Flat. With respect to Moskowite Corner, plaintiffs argue that wetlands reduce development capacity to such an extent that the site is insufficient to accommodate the development of affordable housing. The housing element, however, takes the wetlands into consideration in determining that the site can support 25 affordable housing units. As discussed above, the housing element explains why the county believes that development of affordable housing is fiscally feasible at this site with subsidies from the affordable housing trust.

Plaintiffs contend the county failed to include information about contamination at the Spanish Flat sites. The EIR prepared for the housing element update, however, indicates that most of the Spanish Flat sites are not included on the county list of contaminated sites. Therefore, the county argues, there will be no impact from hazardous materials associated with housing construction at these sites. Two Spanish Flat sites were contaminated by gasoline leaks from an underground storage tanks and are designated as

14

hazardous materials sites. The county points out that it owns one of those sites and, thus, can ensure clean-up before development, and that remediation of the remaining site has already been largely undertaken. The EIR includes as a mitigation measure the requirement that the contamination be remediated prior to development of any housing on these sites. Thus, we perceive no deficiency in the housing element's analysis in this respect.

        d.      Non-vacant Land

For non-vacant sites included in the inventory, the county must include "a description of the existing use of each property" and "specify the additional development potential for each site within the planning period and . . . provide an explanation of the methodology used to determine the development potential. The methodology shall consider factors including the extent to which existing uses may constitute an impediment to additional residential development, development trends, market conditions, and regulatory or other incentives or standards to encourage additional residential development on these sites." (§ 65583.2, subds. (b)(3), (g).)

With respect to the non-vacant parcels of Spanish Flat, the housing element acknowledges that the present owners have not expressed an interest in selling or developing their property. The assessment concludes, however, that incentives can be provided as the economy improves to encourage development. The assessment explains, "Sites C, E and F in the Spanish Flat area are currently used for RV and boat storage. The investments in the site improvements associated with these commercial uses are limited, suggesting that it would not take significant financial incentive to encourage their reuse for housing. . . . Furthermore, as explained below, housing market conditions are expected to be conducive to site redevelopment versus maintaining the sites in these marginal commercial uses. . . . [¶] The potential attractiveness or market demand for development of the Spanish Flat sites is based on future expansion of recreational uses at Lake Berryessa per the Federal government's desire to find a suitable vendor to redevelop the resorts at the lake. While businesses around the lake may be operating at a modest level at best, it is anticipated that once the contract with a resort developer is

15

secured, which was anticipated in 2008, and construction begins that revitalizes the economy in eastern Napa County, the properties with the AHCD zoning will become more attractive for housing development." Accordingly, the county provided a sufficient basis for its determination that the Spanish Flat sites have development potential. (§ 65583.2, subds. (b)(3), (g).)

       2.      The Napa Pipe Site and Program H-4e.

       a.      Suitability for Affordable Housing

In order to meet its share of the regional housing needs for very low, low and moderate income households, the county included Program H-4e in the housing element. This program calls for the county to "rezone 20 acres of the Napa Pipe property to allow housing development at a *minimum* density of 20 dwelling units per acre for 304 dwelling units with associated public open space and neighborhood serving retail." [11] As noted above, section 65583.2, subdivision (c)(3)(B)(iii) includes a presumption that sites in suburban districts with zoning allowing densities of at least 20 units per acre are suitable for affordable housing.

Plaintiffs contend that the county relied improperly on the default density under section 65583.2, subdivision (c)(3)(B)(iii) and that the 20-acre site at Napa Pipe does not have development potential under Program H-4e. The 20 acres are part of a much larger parcel which the current owner, Napa Redevelopment Partners LLS, is seeking to develop. Because the larger parcel is badly contaminated due to prior industrial usage, more time will be required before the proposed development of the full parcel can be considered and approved. The 20 acres within the larger parcel, however, are not contaminated. Plaintiffs argue that even if the county rezones the 20 acres, the small size of the potential development in relation to the 150-plus-acre planned community

---

[11] Contrary to plaintiffs' suggestion, the housing element is not fatally unclear or ambiguous as to what portion of the Napa Pipe site will be rezoned. Although the site consists of two very large parcels, the housing element indicates that the portion to be rezoned will be within the Airport Compatibility Zone E. Moreover, the county has indicated that the 20 acres will be located adjacent to the city's corporate park.

proposed by the developer is inadequate to make the affordable housing projects fiscally feasible. Plaintiffs rely on a letter submitted to the department by the property owner that opines, "No developer would ever go forward with development or the subdivision and sale of such a small portion of the Napa Pipe site for residential development of any kind because of the massive upfront remediation and infrastructure costs necessary to construct housing, including the substantial pollution legal liability challenges arising from segmenting the property in the manner proposed. Furthermore, even with a conventional site (with no remediation requirements and all infrastructure in place), it is not 'realistic' to expect that any private property owner would produce stand-alone project with 50% or more of the housing units designated affordable. Nor is it any more realistic to imagine that a non-profit housing organization would be able to purchase a portion of the Napa Pipe property for such a purpose." An email from the proposed developer of the larger planned community concurs in the opinion that the small portion of the Napa Pipe site proposed to be rezoned by the county is "too small and incomplete to actually be a feasible remediation and master-plan development project which an actual land developer would implement." He faults the county for including only phase I of the development in the housing element rather than addressing "the issue in a realistic way — by rezoning the entire site, and putting in place a measured, long-term phasing plan."

Initially, we reject plaintiffs' challenge to the county's reliance on the statutory presumption to establish suitability for affordable housing. Program H-4e expressly requires the county to rezone the site at a minimum density of 20 units per acre. Section 65583.2, subdivision (c)(1) requires the department to accept the county's calculation of the total housing unit capacity on that site based on the established minimum density.[12] The county recognizes that only 15 acres are needed to accommodate 304 units at the

---

[12] Section 65583.2, subdivision (c)(1) provides: "If local law or regulations require the development of a site at a minimum density, the department shall accept the planning agency's calculation of the total housing unit capacity on that site based on the established minimum density."

17

minimum required density but chose to rezone 20 acres to allow greater flexibility in locating units and to allow room for open space and neighborhood retail. The fact that the program calls for rezoning more acres than necessary to yield the required number of units does not preclude reliance on the minimum density requirement to establish suitability. Having properly relied on the statutory presumption, the county is not required to include an analysis of the fiscal feasibility of its program.

Nonetheless, the county does include additional information in support of its conclusion that the Napa Pipe site, as rezoned under Program H-4e, will be suitable for development of affordable housing. The housing element explains that "market demand for housing at this location is anticipated to be strong, due to proximity to the job center in the Napa Airport industrial area specific plan, as well as proximity to jobs in the adjacent City of Napa." The housing element acknowledges that the larger development plan is already pending before the county and preparation of an environmental impact report is underway. As stated in the housing element, "because the development proposal would take many years to build out and urban services are immediately available to only a portion of the site, only the first phase of the proposal (20 acres total) was included in the inventory of sites suitable to accommodate lower-income housing needs." The housing element explicitly recognizes that the financial feasibility of the affordable housing project is "predicated on execution of a development agreement regarding build-out of entire site in multiple phases." Thus, timing aside (discussed in section c, *post*), the housing element properly considers the financial feasibility and suitability of the 20-acre Napa Pipe site for low cost housing.[13]

    b.  Infrastructure

Plaintiffs also challenge the county's analysis of infrastructure at the Napa Pipe site. The housing needs assessment, however, notes that the site has sufficient groundwater and that the Napa Sanitation District can provide the treatment and

---

[13] In light of this conclusion, any potential error in excluding the correspondence from the owners and prospective developer of the larger site, opining that development of the smaller site alone is not feasible, is harmless.

distribution services necessary to utilize the supply of groundwater. Additionally, the City of Napa has indicated that it is willing to work with the county to provide necessary services to the 20 acres included in the inventory. The housing element also includes program "H-2l," which will allow use of the affordable housing trust fund for infrastructure assistance. Accordingly, the county's analysis of the infrastructure needs at the property complies with state requirements.

     c.   Environmental Considerations

Plaintiffs argue that due to the significant environmental contamination of the larger Napa Pipe parcel, which will require substantial remediation prior to development, it is unlikely that development of the 20-acre portion of that parcel can be completed within the planning period. The housing element recognizes that the contamination poses a significant constraint on development of the full Napa Pipe parcel. Experts for the county have concluded, however, that the smaller 20-acre portion selected for rezoning in the housing element is "absent substantial environmental impacts" and "not subject to on-going regulatory oversight, and active remedial measures are not anticipated for those portions of the [area]."

Plaintiffs argue that this piecemeal approach is not realistic. Plaintiffs rely on concerns expressed by the department, which explained, "the element does not address the potential effects of contamination and necessary remediation on the suitability and availability of the Napa Pipe for development in the planning period. Based on comments received pursuant to Government Code section 65585(c), the department understands an environmental clean-up plan is pending approval with the regional Water Quality Board but the plan and potential availability of the site in the planning period is based on entitlement for residential development much larger than the 20 acres proposed in Program H-4E. Environmental cleanup and the availability of the Napa Pipe site for development in the planning period may not be feasible if Program H-4E is limited to 20 acres. [¶] As a result the element should include an analysis of the suitability and availability of the Napa Pipe site specific to remediation impacts on development feasibility in the planning period. Based on this discussion, the element may require

19

additional or revised programs as appropriate to facilitate residential development capacity at appropriate densities sufficient to accommodate the shortfall of 259 units affordable to lower-income households in the planning period. For example, the element could revise Program H-4E to rezone a sufficient amount of land to allow remediation and development of the site in the planning period in addition to rezoning 20 acres to address the shortfall of sites."

The department's opinion relies in part on a letter written on behalf of the owner of the Napa Pipe parcel, which asserts that "there is no clean-up plan geared toward the 20-acre/300-unit scenario. The only plan that has been prepared, much less approved would bring about thorough cleanup in all the significantly impacted areas of the whole site" and that preparing a "technically sound cleanup plan" for the smaller 20-acre site would require new analysis, a new public comment period and would not necessarily be approved by the regional Water Quality Control Board. Napa Redevelopment Partners LLS was also concerned that if a scaled-back clean up approach was adopted and the housing developed, further site remediation would be "highly problematic on account of the potential dust, noise and fume impacts to the residents."

To further support their argument that the 20-acre parcel cannot be developed within the planning period, plaintiffs proffered the declaration of Joshua Simon in which he expresses concern that the contamination of the larger site will make it difficult to obtain financing for the smaller development project. "Given that a portion of the site has tested as 'clean' from an environmental standpoint, it would appear that this portion of the site may be available for development. However, I know that many lenders may be concerned, even if the site has remained uncontaminated, about the possibility of contamination of the clean portion of the site from the portions of the site that are contaminated. Certainly, it would be much easier for an affordable housing development to proceed if the county permitted the remediation and development of the entire site as the developer has planned. Parsing out the portions of the site the county deems

20

acceptable for development would make it difficult for the developer of the sites to obtain financing and would probably add cost if the lender required any guarantee." [14]

Assuming that development of the 20-acre parcel will in fact be delayed beyond the planning period because of the remediation needs of the surrounding land, the housing element is not for that reason in noncompliance with state law. Section 65583, subdivision (c)(1) requires the county to adopt a program that will "[i]dentify actions that will be taken to make sites available during the planning period with appropriate zoning and development standards and with services and facilities to accommodate that portion of the city's or county's share of the regional housing need for each income level." Program H-4e within the housing element requires rezoning of the 20 acres, which are not contaminated and do not require remediation. By rezoning during the planning period the county will have made the 20 acres available so that they can be developed. The housing law does not require full development of the site to be completed within the planning period. (*Fonseca*, *supra*, 148 Cal.App.4th at pp. 1206-1207 ["while the element does not express that its programs and action items will yield the desired results soon enough in the planning period to permit full development within that period, these were not required for substantial compliance with the statute"].) If delay results from the present developer's plan to develop the larger parcel, such delay does not establish a lack of compliance with the Housing Element Law.

While there may well be a sound basis for the plaintiffs' concerns, we cannot say the county's approach fails to comply with the minimum statutory requirements or is arbitrary. As discussed more fully below, nothing in the record suggests there are alternative sites that the county could realistically designate for development of low cost housing within the planning period. The plan to develop the full Napa Pipe site promises to bring significant affordable housing to the area, and there is no suggestion that these

---

[14] Simon's declaration was among the evidence that the trial court ruled could not be considered. Assuming the exclusion of the declaration to have been in error and the opinions he expressed to be sound, there was no prejudice because, for the reasons that follow, nothing included in the declaration shows that the housing element failed to comply with the statute.

efforts are not progressing as fast as reasonably possible. By making the smaller acreage available for development before the remaining property is available, the county complies with the requirements of state law while proceeding apace with the steps necessary to achieve the ultimate objective of constructing the needed low cost housing units. The county's action does not reflect an abuse of discretion. (*Fonseca, supra*, 148 Cal.App.4th at pp. 1206-1207, *Hernandez, supra*, 28 Cal.App.4th at p. 1068.)

F.      Conclusion

In summary, we conclude that the county's housing element substantially complies with the requirements of the state Housing Law and does not constitute an abuse of discretion. Without minimizing plaintiffs' well founded concern over the lack of affordable housing within the county, and for the failure to have increased this housing stock over a prolonged period, we cannot say that the county's housing element does not comply with the minimum mandates of state law. [15]

## II.      Density Bonus Law

In 1979, the Legislature enacted the Density Bonus Law, section 65915, which aims to address the shortage of affordable housing in California. (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 823.) "Although application of the statute can be complicated, its aim is fairly simple: When a developer agrees to construct a certain percentage of the units in a housing development for low or very low

---

[15] Our conclusion should not be read as an endorsement of the county's plan to encourage the development of affordable housing. Under the applicable standard of review the court must determine whether the county's housing element substantially complies with the minimum requirements of state law, but the court may not review the merits of the county's policy determinations. Substantial compliance with the Housing Element Law, however, does not insulate the county against claims of housing discrimination. We conclude in section III, *post,* that the trial court correctly rejected plaintiffs' current claims of discrimination, in part because of their failure to identify any specific action or inaction by the county that can be deemed to have had a discriminatory impact. Should the county renew its housing element with knowledge that there is no realistic possibility that it will result in the actual development of affordable housing—because, for example, it rezones too small a portion of the Napa Pipe area to make such development feasible— such action might well provide evidence of proscribed discrimination.

income households, or to construct a senior citizen housing development, the city or county must grant the developer one or more itemized concessions and a "density bonus," which allows the developer to increase the density of the development by a certain percentage above the maximum allowable limit under local zoning law. [Citation.] In other words, the Density Bonus Law 'reward[s] a developer who agrees to build a certain percentage of low-income housing with the opportunity to build more residences than would otherwise be permitted by the applicable local regulations.' " (*Id*. at p. 824, citing § 65915, subds. (a), (b).) To ensure compliance with section 65915, local governments are required to adopt an ordinance establishing procedures for implementing the directives of the statute. (§ 65915, subd. (a).)[16]

In 2010, the county amended its ordinance implementing the state Density Bonus Law. (Napa County Mun. Code, § 18.107.150.) The county's new density bonus ordinance provides in relevant part: "This section describes those density bonuses provided pursuant to Chapter 4.3 (commencing with Section 65915) of Division 1 of Title 7 of the Government Code. These density bonuses shall be provided, at the request

---

[16] Section 65915 provides in relevant part: "(a) When an applicant seeks a density bonus for a housing development within, or for the donation of land for housing within, the jurisdiction of a city, county, or city and county, that local government shall provide the applicant with incentives or concessions for the production of housing units and child care facilities as prescribed in this section. All cities, counties, or cities and counties shall adopt an ordinance that specifies how compliance with this section will be implemented. . . . [¶] (b)(1) A city, county, or city and county shall grant one density bonus, the amount of which shall be as specified in subdivision (f), and incentives or concessions, as described in subdivision (d), when an applicant for a housing development seeks and agrees to construct a housing development, excluding any units permitted by the density bonus awarded pursuant to this section, that will contain at least any one of the following: [¶] (A) Ten percent of the total units of a housing development for lower income households, as defined in Section 50079.5 of the Health and Safety Code. [¶] (B) Five percent of the total units of a housing development for very low income households, as defined in Section 50105 of the Health and Safety Code. [¶] . . . [¶] (D) Ten percent of the total dwelling units in a common interest development as defined in Section 1351 of the Civil Code for persons and families of moderate income, as defined in Section 50093 of the Health and Safety Code, provided that all units in the development are offered to the public for purchase."

23

of an applicant, when that applicant provides target units in addition to the affordable units required by Section 18.107.080 and otherwise complies with the requirements of this chapter." Section 18.107.080, which was enacted at the same time, added an "inclusionary requirement" which requires up to 20 percent of new dwelling units in a residential development project be made available at prices affordable to moderate-income households. (Napa County Mun. Code, § 18.107.080(A).) Section 18.107.080(D) of the Napa County code reiterates that "units that qualify a project for a density bonus pursuant to Government Code section 65915 and section 18.107.150 must be provided in addition to the affordable units required by this section and do not meet the affordable housing requirements contained in this section."

Soon after its adoption, plaintiffs amended their complaint in this action to include a cause of action alleging that the county's amended density bonus ordinance conflicts with the state Density Bonus Law. Plaintiffs allege that the county ordinance impermissibly requires the developer to include a higher percentage of affordable units than section 65915 requires in order to obtain a density bonus.[17] The ordinance does so

---

[17] Plaintiffs also argue that the county ordinance impermissibly (1) requires long term affordability covenants on moderate-income units; (2) requires a developer to build at a higher density that allowed by the zoning code in order to qualify for incentives; and (3) restricts concessions and incentives and requires unduly burdensome documentation to receive a density bonus. The trial court refused to consider these arguments, finding that plaintiffs had failed to exhaust their administrative remedies with respect to them, as required by section 65009, subdivision (b)(1), which provides that except in limited inapplicable exceptions, "[i]n an action or proceeding to attack, review, set aside, void, or annul a finding, determination, or decision of a public agency made pursuant to this title at a properly noticed public hearing, the issues raised shall be limited to those raised in the public hearing or in written correspondence delivered to the public agency prior to, or at, the public hearing." We agree with the trial court. On appeal, plaintiffs have not identified any specific reference in the documents submitted to the board in which they raised these issues. Rather, they claim that they submitted a letter to the board which "[i]n addition to raising specific concerns regarding the issue involving the inclusionary units," . . . "states that it is 'important that whatever ordinance the county adopts be fully consistent with [§ 65915.]' [Citation.] The letter attached an article describing the requirements of § 65915. [Citation.] In addition, a sample density bonus ordinance for another jurisdiction was included as a model for the language that should be incorporated in the Napa County Ordinance." More was required to advise the county that plaintiffs contend the draft ordinance impermissibly imposed the additional restrictions and requirements now challenged. Accordingly, we consider only

24

by excluding from the target units necessary to qualify for the density bonus those units necessary to satisfy the county's inclusionary requirement. "For example, while under state law, density bonuses, concessions and incentives must be allowed where a developer agrees to restrict 10% of the project's units to lower-income households, under the county's ordinance, a developer only qualifies when it has restricted at least 22% of a projects units to lower-income households." Plaintiffs contend the county's ordinance places a greater burden on developers than is permissible under state law. We agree.

In *Friends of Lagoon Valley v. City of Vacaville*, *supra,* 154 Cal.App.4th at p. 823, this court considered essentially the opposite situation, holding that the City of Vacaville could in its discretion award a greater density bonus than the bonus required by section 65915. We explained, "Although the calculations described are complicated, in our view the language of Section 65915 is clear and unambiguous. If a developer agrees to dedicate a certain percentage of the overall units in a development to affordable or senior housing, the Density Bonus Law requires the municipality to grant the developer a density bonus of at least a certain percentage, ranging from a low of 5 percent (for moderate income housing) or 20 percent (for senior and all other affordable housing) to a maximum of 35 percent, depending on the number of affordable housing units provided over the minimum number necessary to qualify for a bonus. [Citation.] Because the statute imposes a mandatory duty on local governments, and provides a means for developers to enforce this duty through civil proceedings [citation], it is clear that 35 percent represents the maximum amount of bonus a city is required to provide, not the maximum amount a developer can ever obtain. The entire aim of Section 65915 is to provide incentives to developers to construct housing for seniors and low income families. [Citation.] It would undermine this policy to interpret subdivision (g) as imposing an absolute cap, since such a rule would prevent developers from negotiating to obtain a higher density bonus in exchange for including even more low income or senior housing than is provided for in Section 65915." (*Id*. at pp. 825-826.) This court also

plaintiffs' argument that the ordinance conflicts with state law by requiring a higher percentage of affordable units for a density bonus than required by section 65915.

rejected the argument that "a municipality must enact an ordinance any time it wishes to provide more of a density bonus than is required by state law." (*Id*. at p. 826.) We explained that "setting up an additional hurdle for municipalities to clear (i.e., passing an ordinance) under these circumstances would be contrary to the spirit of the Density Bonus Law, which is designed to encourage, even require, incentives to developers that construct affordable housing." (*Ibid*.) Accordingly, this court has recognized that section 65915 imposes a clear and unambiguous mandatory duty on municipalities to award a density bonus when a developer agrees to dedicate a certain percentage of the overall units in a development to affordable housing. (*Ibid*.)

The county's attempt to distinguish *Friends of Lagoon Valley v. City of Vacaville*, *supra,* is not persuasive. The county argues that although it may be clear that the statute imposes no cap on how much of a density bonus may be granted by a local entity, there is an ambiguity as to whether the local authority may increase the percentage of affordable housing units necessary to qualify for a density bonus. The county argues that the words "seeks and agrees" in section 65915, subdivision (b) imply that the county has discretion to set the minimum requirements for a density bonus. The key sentence on which this argument is based reads: "A city, county, or city and county shall grant one density bonus . . . and incentives or concessions . . . when an applicant for a housing development *seeks and agrees* to construct a housing development" with certain percentages of affordable housing. (§ 65915, subd. (b).) The county argues, "The definitions of both 'seek' and 'agree' connote action that is discretionary and volitional, rather than mandatory, and support the county's requirement that a developer go above and beyond the minimum to receive any density bonus." To resolve this purported ambiguity, the county suggests we consider the legislative history of recent amendments of the statute.

Before resorting to legislative history, however, there must in fact be an ambiguity in the words of the statute. (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) While the language "seeks and agrees to construct" does indeed include a volitional aspect, "affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context" (*ibid.*), that language plainly refers to the voluntary nature of

26

the developer's decision to seek permission and agree to proceed with a project dedicating a portion of the development to affordable housing. There is no implication in this language that the developer must seek and agree to do more than required by local ordinances, including any inclusionary requirement for affordable housing. Indeed, allowing the county to increase the minimum number of affordable units required for a density bonus would conflict with subdivision (f), which bases the amount of density bonus on the percentage of affordable housing units in the project. (§ 65915, subd. (f).)

Were there any ambiguity, the legislative history provides little help in clarifying it. Although the legislative history does indicate that some legislators sought to impress the county's interpretation into the statute, others disagreed. The exchange within the Legislature is at best inconclusive. As explained in the trial court's discussion of the legislative history, "When Government Code section 65915 was amended in 2005, the original bill was initially amended to delete the phrase 'seeks and agrees to construct.' Ultimately, however, the language was reinserted into the bill and included in the statute as amended. An analysis of the third reading of the bill as amended on August 18, 2005, notes specifically that the 'seeks and agrees to construct' language that was added back to the bill on June 21, 2005 'was intended to clarify that these density bonus requirements only apply when either: 1) a local government does not have an inclusionary housing ordinance or 2) an applicant proposes to include affordable units over and above those required by a locally adopted ordinance. That amendment was adopted by the Assembly Housing Committee to clarify that issue.' [¶] Contrarily, a senate floor analysis prepared on August 22, 2005, states that the Assembly amendment reinserting the 'seeks and agrees to construct' language 'means that any affordable housing units in a development count toward meeting density bonus requirements, regardless of whether or not affordable units are required to be constructed by the local government pursuant to a local ordinance.' However, another Senate Floor analysis, prepared by apparently the same person 7 days later, deletes the foregoing interpretation from the analysis. It also includes the following argument by the author of the bill in support of it: [¶] 'When AB 435 was heard in the Assembly Housing and Community Development Committee the bill was

27

amended in order to not place the bill at risk. One of the amendments restored the law pertaining to subdivision (b)(1). This subdivision relates to whether an applicant "agrees" to construct affordable units. My statement before the committee concerning the amendment was: '. . . A handful of local jurisdictions have argued since 1979 that the density bonus law does not apply until inclusionary requirements have been met. The vast majority of cities, counties and experts take the opposite view, as do I. By adding back language that has been the law since 1979 [the "seeks and agrees to construct"], we will enable this handful of jurisdictions to continue to make their strained argument, but that is not troubling because the language has consistently been interpreted for 25 years by the vast majority of cities, counties and experts to mean that inclusionary requirements count toward meeting density bonus requirements." ' "

We conclude that the interpretation of "the vast majority of cities, counties and experts" correctly reflects the plain meaning of the statutory language. The county's ordinance which fails to credit low cost units satisfying the county's inclusionary requirement toward satisfying the density bonus requirements fails to comply with the state law. To the extent the ordinance requires a developer to dedicate a larger percentage of its units to affordable housing than required by section 65915, the ordinance is void. (*Friends of Lagoon Valley v. City of Vacaville*, *supra,* 154 Cal.App.4th at p. 830 [An otherwise valid local ordinance that conflicts with the state Density Bonus Law is preempted.]; *Sherwin–Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897 [" 'If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.' "].)

The county suggests that if the ordinance is otherwise invalid, the ordinance is "saved" by the provision in section 18.107.190 that states, "If any section of this chapter conflicts with Government Code Section 65915 or other applicable state law, state law shall supersede this chapter." It argues, "if application of the ordinance to any specific development proposal conflicts with the state Density Bonus Law, the county may not enforce it" and "[f]or this reason alone, this court may affirm the judgment."

28

The county relies on *Shea Homes Ltd. Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1265-1266. In that case, the court rejected a claim that a local agriculture and open space measure adopted by popular vote conflicted with the state density bonus law. The court reasoned that while the challenged measure required the county to meet its state-imposed housing obligations in a particular portion of the county, it also "specifically states that none of its provisions shall be applied so as to preclude the County's compliance with state law housing obligations" and the measure included two mechanisms to ensure compliance with those housing obligations if the restrictions adopted by the measure should prevent it. (*Id.* at pp. 1265-1266.) The "savings" provision included in the county's ordinance in the present case, however, does no more than state the truism that state law prevails over conflicting local law. Section 18.107.190 does not modify any particular provision of the local ordinance nor does it identify any provision of state law that controls under any particular circumstances. Persons reading the ordinance without the benefit of a legal opinion as to the extent of its validity would understand that units satisfying the inclusionary requirement do not count towards the number of units necessary to qualify for the density bonus. Since that requirement does violate the statute, a writ of mandate should be issued to require its removal from the ordinance.

### III.    Housing Discrimination

Plaintiffs assert housing discrimination claims under three statutes: 42 United States Code section 3604, subdivisions (a) and (f) of the Fair Housing Act, which makes it unlawful to "make unavailable or deny[] a dwelling to any person because of race" or because of a household member's disability; section 12955, subdivision (l) of the California Fair Employment and Housing Act, which makes it unlawful to discriminate through public or private land use practices, including the use of zoning laws to "make housing opportunities unavailable" because of race or disability; and section 65008 of the Planning and Zoning Law, which invalidates planning actions that "den[y] to any individual or group of individuals the enjoyment of residence" because of their race or disability, and makes it unlawful for a county "in the enactment or administration of

29

ordinances pursuant to any law" to "discriminate against any residential development . . . [b]ecause the development . . . is intended for occupancy by persons and families of very low, low, or moderate income . . . ." In the context of the land use and zoning policies at issue in this case, the three statutes govern essentially the same activities in the same way and require similar proofs. (*Keith v. Volpe* (9th Cir. 1988) 858 F.2d 467, 485; *The Committee Concerning Community Improvement v. City of Modesto* (9th Cir. 2009) 583 F.3d 690, 702). The statutes have been broadly construed "to encompass actions by individuals or government units that affected the availability of housing to [protected classifications]." (*Jackson v. Okaloosa County, Fla.* (11th Cir. 1994) 21 F.3d 1531, 1542, fn. 17.)

Initially, we reject plaintiffs' contention that the court construed their claims too narrowly, assertedly failing to consider the impact of the county's "overall zoning scheme." The trial court's decision states explicitly that plaintiffs were challenging "the entirety of the county's land-use regulatory system as it relates to housing." For this reason, the court heard evidence on the system's key features and on its application to specific portions of the county. In its extensive statement of decision, the court set out a detailed recitation of the evidence regarding the county's zoning code, including "(1) pertinent general features of the Napa County zoning code," "(2) specific zoning districts in Napa County," "(3) development patterns in Napa county," (4) zoning features at "specific locations within Napa County," and "(5) factors affecting development of affordable housing." The court made findings regarding the impact of the various zoning features, as well as of other factors, on the availability of affordable housing. Insofar as the court's analysis emphasizes the zoning applicable to the sites identified in the housing element as suitable for affordable housing, the decision responds to the evidence presented at trial. Plaintiffs' own expert testified that he "was asked to examine the county's zoning related to development of housing, to particularly look at the feasibility of the four clusters of sites that are designated under the AHCD zoning and . . . to note the constraints and alternatives for development of affordable housing." The court did not, as plaintiffs suggest, consider "only the small subsection of the county's zoning

30

policy that 'related to the assignment of general plan designations to meet the county's share of affordable housing.' "

Likewise, contrary to plaintiffs' suggestion, the court did not apply an incorrect legal standard in evaluating plaintiffs' claims. The court's decision states, "To prove discrimination in violation of [the federal Fair Housing Act], [the state Fair Employment and Housing Act], or the planning and zoning law, the evidence must show that the effect of county laws or actions on the availability of housing is to discriminate among persons on the basis of one or more characteristics set forth in these statutes as unlawful bases for discrimination. The evidence need not show that county laws discriminate expressly on any of these unlawful bases. Rather, on the allegations of this case, plaintiffs could prevail if the evidence showed that county laws and actions have had, or will have, the effect of making housing affordable to households with moderate and lower incomes unavailable." The court articulated the correct standard (see *Jackson v. Okaloosa County, Fla.*, *supra,* 21 F.3d at p. 1542, fn. 17 [statutes encompass actions by government units that affect the availability of housing to protected classifications]), and did not, as plaintiffs suggest, require them "to show that the county actually prevented or removed affordable housing." Although the court did not use the language "make it more difficult for Latinos or people with disabilities to obtain housing," the decision, fairly read, makes clear that the court understood that plaintiffs would be entitled to relief if the county's policies were shown to have such an effect.

Plaintiffs assert that the evidence establishes both discrimination based on a disparate impact theory and intentional discrimination. We shall consider each contention in turn.

A.      Disparate Impact

Plaintiffs contend that "Napa County maintains a zoning scheme that limits, if not effectively prohibits, the construction of affordable housing anywhere in the unincorporated portions of the county," which has a greater impact on Latinos and people with disabilities who rely on affordable housing to a greater extent than other county residents. The trial court found that "[w]hether or not the availability of affordable

31

housing differentially affects groups identified in the [federal Fair Housing Act], [state Fair Employment and Housing Act], or the planning and zoning law, the evidence did not prove that the county's land-use regulations have restricted or will restrict the availability in Napa County as a whole of housing affordable to households with very low, low, and moderate incomes." The court explained that "[e]vidence showed that some county actions increase the supply of affordable housing in Napa County, but no evidence showed that other county actions decrease it." According to the trial court, "the evidence did not demonstrate that the county's existing land-use rules or actions will result or have resulted in Napa County's having, overall, fewer housing units affordable to households with very low, low and moderate incomes than would exist under a different system of county land-use rules or actions." In other words, while recognizing that there is a shortage of affordable housing in the county, the court found that the shortage was not caused by the county's land use policies. (See *Gallagher v. Magner* (8th Cir. 2010) 619 F.3d 823, 836, fn. 4 ["Merely showing that there is a shortage of housing accessible to a protected group is insufficient to establish a prima facie case for a disparate impact claim. Plaintiffs must also show that such a shortage is causally linked to a neutral policy, resulting in a disproportionate adverse effect on the protected population."].) We find no error in the court's decision.

Plaintiffs' disparate impact claim is analyzed under a three-step process. "First, [plaintiffs] must establish a prima facie case, which requires showing 'that the objected-to action[s] result[ed] in . . . a disparate impact upon protected classes compared to a relevant population.' [Citation.] Stated differently, [plaintiffs] 'must show a facially neutral policy ha[d] a significant adverse impact on members of a protected minority group.' [Citation.] [Plaintiffs] are not required to show that the policy or practice was formulated with discriminatory intent. [Citations.] If [plaintiffs] establish a prima facie case, the burden shifts to the [county] to demonstrate that its policy or practice had ' "manifest relationship" ' to a legitimate, non discriminatory policy objective and was necessary to the attainment of that objective. [Citation.] If the [county] shows that its actions were justified, then the burden shifts back to [plaintiffs] to show 'a viable

32

alternative means' was available to achieve the legitimate policy objective without discriminatory effects." (*Gallagher v. Magner*, *supra*, 619 F.3d at pp. 833-834; see also *The Committee Concerning Community Improvement v. City of Modesto*, *supra*, 583 F.3d at p. 711.)

Critical to plaintiffs' prima facie case is the identification of the policy or practice being challenged. (*Gallagher v. Magner, supra,* 619 F.3d at p. 834.) For example, in *United States v. City of Parma* (6th Cir. 1981) 661 F.2d 562, 575-576, the court found an impermissible discriminatory impact from an ordinance requiring two and one-half parking spaces per residential unit, which increased the cost of housing and disproportionately affected racial minorities. In *Huntington Branch, N.A.A.C.P. v. Town of Huntington* (2d Cir. 1988) 844 F.2d 926, 937-942, the town's refusal to permit construction of multifamily dwellings outside of an urban renewal area was held to disproportionately affect the availability of housing for racial minorities. Plaintiffs' insistence here that they are challenging "the entirety of Napa County's zoning scheme" makes it somewhat difficult to evaluate their claims. They argue that the county's "set of zoning policies" "generally restricted the ability of developers to construct affordable housing," but provide little additional specificity in their appellate briefs as to precisely which policies allegedly have such an effect.

In the trial court, plaintiffs at one point made reference to the following specific "land use and zoning laws, policies and practices" that allegedly adversely affect the availability of affordable housing in Napa County: (1) "limiting residential density to levels that will not support affordable housing"; (2) "assigning general plan designations to sites that lack adequate infrastructure and amenities"; and (3) "assigning general plan and zoning designations to small scattered sites."[18] In supporting these arguments,

---

[18] Plaintiffs' trial brief also identified the elimination of particular zoning categories such as urban residential as a practice that adversely affects the development of affordable housing, but the trial court found that the issue had been waived because "there was no presentation of specific evidence and argument on this issue." Plaintiffs have not challenged this finding on appeal.

plaintiffs relied primarily on their expert's opinion that multi-unit affordable residential development at the sites identified in the housing element is not fiscally feasible, or at least is made more difficult, by the isolation of the sites and low-density zoning. [19] The expert also explained that by selecting sites that are far from urban centers, potential developers are unlikely to receive tax credits and other financial benefits that make the development of affordable housing more feasible.

The trial court rejected the expert's opinion that the county's low-density zoning contributes to lack of affordable housing in the county. The court pointed out that plaintiffs "identified no area in unincorporated Napa County in which a change in zoning would cause construction of housing affordable to low- or very-low income households." Plaintiffs' expert acknowledged that he was unable to "identify any site in the unincorporated portion of Napa County that is not presently zoned for multifamily housing but on which [he believed] that multifamily housing, housing for a person with low or very low incomes would be developed if the county rezoned it."

The court identified a number of other factors that discourage the development of affordable housing in the county. "Most of unincorporated Napa County is rural. The population density in the unincorporated area is generally low. Public transit services, schools, hospitals, and retail businesses are concentrated in the Napa Valley, and travel

---

[19] The expert opined that because the isolated sites identified by the county have limited access to necessities and amenities, any potential development "would need to have enough scale to be able to pay to bring these in." While he acknowledged that the county's planned development (PD) zoning is "a good ordinance for housing in general," he did not believe much affordable housing would be built in those zoning areas. He explained, "PD zoning requires a lot of amenities to be built on and again you have the scale problem where not only [do] you have to generate enough [] money to build the building, but also to build the sites. PD zoning, for example, requires 50 percent of the property [to] be open space. That's gonna require landscaping. That's not including operating costs. Those operating costs get spread out over [the] number of units. [If y]ou can't put enough units on the site, it gets difficult to pay for those costs. It's not really a problem from the market rate where the elements are high." The expert also opined that while the AHCD overlay increased permissible density, it also included considerable additional requirements relating to transportation and infrastructure which add additional costs.

34

distances from the majority of the county to such services are long." In addition, "[a] person wishing to develop any new housing in unincorporated Napa County must demonstrate access to sufficient potable water to serve the residents, and must arrange for treatment of the wastewater they generate. . . . [¶] . . . The county itself provides neither water not wastewater service." The court found that these barriers to development "apply identically to housing intended for rental or sale at market rates and to housing intended to be affordable for households of moderate, low, or very low incomes." Although the county had not recently approved any low-cost housing, neither had it "denied permission to construct any new affordable or market-rate multifamily residential development in unincorporated Napa County in several years."

The court also rejected the argument that the assignment of AHCD designation to sites that currently lack infrastructure and are generally located far from the urban centers makes housing "unavailable" within the meaning of the discrimination statutes. The court explained that plaintiffs are challenging "the county's policies and practices not because they make it more difficult to obtain affordable housing than it would be without such policies and practices, but rather because they make it more difficult than it would be if they had different, more development-friendly policies and practices. The court is unaware of any case in which a court found that a policy or practice of designating sites for affordable housing was found to be discriminatory simply because it was not likely to accomplish that purpose as well as other policies and practices might. To find discrimination for not optimizing the development of affordable housing would open the door to a discrimination claim virtually every time sites are designated for affordable housing, since arguably there would always exist sites better suited for the promotion of affordable housing."

The trial court was correct that the failure to adopt potentially more effective affirmative measures is not a practice that supports a disparate impact claim. Although the state Housing Element Law imposes upon the county a role and responsibility to contribute to the "attainment of the state housing goal" (§§ 65580, subd. (c), 65581, subd. (a)), as indicated *ante*, the county has satisfied its obligations under that statute. Its

35

failure to do more is not the equivalent of discrimination. Moreover, plaintiffs have not challenged the trial court's findings that the county established legitimate reasons for its low-density zoning scheme, including a preference for "urban-centered growth and preservation of agricultural land for employment" and that "the evidence showed neither that any of plaintiffs' proposed alternative land-use regulations[20] would achieve the county's urban-centered development objectives nor that they would achieve the county's objectives while improving the county's affordable housing supply." For multiple reasons, therefore, the court properly rejected plaintiffs' disparate impact claim.

B.    Intentional Housing Discrimination

Plaintiffs contend the county has intentionally discriminated against affordable housing "by constraining, discouraging and failing to permit" development of affordable housing. To establish such discrimination, plaintiffs must show (1) that the county's policies had a discriminatory effect and (2) that the county adopted these policies with an intent or purpose to discriminate against the development of affordable housing. (*The Committee Concerning Community Improvement v. City of Modesto*, supra, 583 F.3d at pp. 702-703; *Keith v. Volpe*, *supra*, 858 F.2d at p. 482 [A discriminatory effect means "that 'the conduct of the defendant actually or predictably results in . . . discrimination.' "].) The trial court found that plaintiffs failed to prove either element. As discussed

---

[20] Alternatives suggested by plaintiffs include the county purchasing affordable housing sites and remediating contamination in preparation for development, enacting zoning ordinances that allow greater densities, modifying setback requirements in zoning ordinances applicable to the sites selected for affordable housing to reduce construction costs, and rezoning parcels closer to the cities under the residential multifamily designation. At oral argument, plaintiffs' counsel emphasized the proposed alternative of using the residential multifamily (RM) zoning designation or incorporating those standards into the planned development (PD) zoning category. The county's planning director testified at trial, however, that the zoning ordinance already incorporates this "alternative" because the PD section of the zoning ordinance references other zoning districts, including RM zoning, and provides that uses allowed under those other designations are allowed within a PD zone. Although plaintiffs' counsel sought to distinguish between incorporating the uses allowed in the RM zoning and the density allowed under RM zoning, the planning director, who is charged with interpreting the ordinance for the county, did not find the distinction important. She testified that because housing developments including 20 units per acre are permitted under the RM zoning, "we would interpret those as being allowed in the PD [zones]."

36

above, plaintiffs failed to prove that the county's facially-neutral land use policies constrained or discouraged the development of affordable housing. On this basis alone, the judgment may be affirmed. However, substantial evidence also supports the trial court's finding that the county has not acted with discriminatory animus.

Proof of discriminatory purpose may include both direct evidence of discriminatory intent and indirect evidence that creates an inference of discriminatory intent. (*Gallagher v. Magner*, *supra*, 619 F.3d at p. 831.) "Direct evidence is evidence 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse . . . action." (*Ibid*.) "Direct evidence does not include stray remarks . . ., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself." (*Ibid*.) Relevant indirect evidence of discriminatory intent may include, among other things, "the historical background of the decision, the sequence of events leading up to the decision, and any relevant legislative or administrative history." (*The Committee Concerning Community Improvement v. City of Modesto*, *supra*, 583 F.3d at p. 703, citing *Village of Arlington Heights v. Metropolitan Housing Development Corp*. (1977) 429 U.S. 252, 267-268 (*Arlington Heights*); *LeBlanc-Sternberg v. Fletcher* (2d. Cir. 1995) 67 F.3d 412, 425-426.)[21]

---

[21] Contrary to plaintiffs' suggestion, the trial court's decision is not deficient because it fails to address separately each of the factors that the United States Supreme Court in *Arlington Heights* held to be relevant in evaluating a claim of intentional discrimination, or to address all of plaintiffs' evidence. "A statement of decision need not address all the legal and factual issues raised by the parties. Instead, it need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1124-1125.) While the section of the court's statement of decision entitled "Plaintiffs have not shown direct evidence of discrimination" expresses its findings in a relatively summary fashion, read as a whole the statement of decision addresses each of the relevant legal factors and sufficiently identifies the evidence that supports the court's finding.

37

While for reasons discussed below we question the significance of the evidence on which plaintiffs rely to establish discriminatory animus, even assuming that some evidence does tend to support their contention, the trial court's contrary finding must be upheld if the record contains evidence that supports its finding. When an appellate court is faced with a challenge to the sufficiency of the evidence supporting a questioned finding, the standard of review is the substantial evidence rule. The presumption is in favor of the judgment and if the evidence is in conflict, an appellate court will not disturb the trial court's findings. All factual matters, including inferences reasonably drawn from the evidence, are viewed most favorably to the prevailing party and in support of the judgment. (*Turman v. Turning Point of Cent. California, Inc.* (2010) 191 Cal.App.4th 53, 58.)

The trial court identified several steps the county has taken in an attempt to encourage the development of affordable housing. The AHCD zoning increases permissible density levels for affordable housing projects and thus, as the court noted, "would permit, not preclude, development of multifamily housing including affordable housing." The court found that the county adopted the AHCD zoning to encourage the development of affordable housing and applied it at sites throughout the county that are most suitable for affordable housing. The county has created an affordable housing fund that is available to "assist developers of affordable housing in addressing the cost of providing water or wastewater services" and "to subsidize development or operation of affordable housing." Loans have been made from the affordable housing fund to subsidize the development of over 700 units of affordable housing in cities within the county. The court also noted that "[a]lthough no multifamily residential development has occurred in recent years," the county has approved development of 10 second units a year, the market rents for which are affordable to households with moderate incomes, and has ensured through code enforcement that the 70 to 80 farm labor dwellings currently in the county remain in use for farm workers. In 2009, when the county updated the housing element, the Napa Pipe sites were included and other sites deemed less appropriate were removed. Despite the concerns regarding the environmental contamination at the Napa

38

Pipe sites, which is delaying the ability to develop those sites, plaintiffs' expert acknowledged that "Napa Pipe is actually the best of all sites primarily because there's a potential to build enough scale to be able to provide the amenities. And . . . it's in one of the employment growth areas for the county."[22]

To prove the county's intent to discriminate against affordable housing, plaintiffs relied primarily on the history of potential development in an area of the county referred to as the "Monticello Road" sites, statements made by "county decisionmakers," and the fact that "virtually no units of housing affordable to low- and very-low-income persons have been built in the unincorporated county since at least 2004."

As to the Monticello Road sites (located near Silverado Country Club), in 2004 the county's housing element identified these sites, to which the AHCD zoning was then applicable, as suitable for the development of affordable housing. In July 2006, a developer wrote to the county and the Local Agency Formation Commission (LAFCO) expressing its interest in developing affordable housing on one of the sites on Monticello Road. The letter requested that the proposed development site be included in the sanitation district's sphere of influence, which LAFCO was then reviewing. After receiving the developer's letter, the county wrote LAFCO, reiterating its prior March 2006 request that LAFCO defer action on adjustments to the sanitation district's sphere of influence pending the county's general plan update. The county's July 2006 letter states, "The [Napa Sanitation Department] Comprehensive Sphere of Influence Review report dated July 2006 accurately summarizes the position of the county when it states that there are several parcels located along Monticello Road designated for affordable housing that may be appropriate sites to receive sewer services. We wish to reiterate that

---

[22] While the inclusion of Program H-4e in the Housing Element to rezone 20 acres on Napa Pipe property for the development of affordable housing may at this point be considered a positive step by the county toward encouraging the development of affordable housing, we again note that continued reliance on the rezoning of only 20 acres of the Napa Pipe site may demonstrate a discriminatory animus, should it become clear that the parcel rezoned under Program H-4e will not realistically support the development of affordable housing.

the county supports the development of affordable housing on those parcels listed in the housing element and supports the extension of services to these sites." The letter explained that its request was "not intended to exclude [the Monticello site] from the sphere, but rather to ensure that a thorough analysis of all appropriate and necessary services to the broader area is conducted after the county land use policies have been reviewed."

The Monticello Road sites were removed from the housing element when it was revised in 2008. Plaintiffs contends that their removal evidences the county's hostility to affordable housing and that this contention is buttressed by the developer's testimony that county Supervisor Bill Dodd told him that affordable housing would be developed at the Monticello Road site "over [his] dead body." However, whatever Supervisor Dodd's views may have been,[23] the developer acknowledged that other than the letter written to

_____

[23] Plaintiffs also presented evidence of Supervisor Dodd's statements at a meeting on October 14, 2008, at which he acknowledged that he had voted to include the Monticello Road sites in the 2004 housing element only because he was confident that affordable housing would never be built there. At the meeting, Dodd stated: "[R]ecalling back to the last housing element cycle process, we were challenged legally, and the board went into closed session, as we have the right to do, to settle lawsuits, and . . . [the Monticello Road] sites were put in by the board without any public hearing, and at the time I agreed with it because I thought it was the right thing to do for the county. We were in harm's way, we would have stopped all building permits, everything, not only just in that area . . . [a]nd that would have just stopped commerce altogether in my view in Napa County. And I had supervisors even looking at me in the closed session and saying are you sure, do you want to do that, that's political suicide. Sure. That was one of the things I think that we needed to do to take it on the chin, and put those housing sites on there. Now to be clear, and I've told other people this, without the services, the water and the sewer, it was not a big gamble. It wasn't a gamble at all because I didn't think that those things would be built in this timeframe anyway. Nor do I think they'll be built in the future. They're not, as far as LAFCO is concerned, the Napa Sanitation District is not, that whole area is not annexed in at this time. Nor do I think it will be until this issue is adjudicated one way or another." Dodd explained that in his opinion, development at the Monticello Road sites was "dumb growth" and that "it's ridiculous to put that kind of intensity that far away from the services and everything else." He indicated that he agreed to the inclusion of those sites in the prior housing element because he had "a 5-0 vote from the board of supervisors that as soon as that was practicable we would remove the affordable housing overlay zone from that area."

LAFCO, no application for the extension of services to the site was ever made and that he had abandoned the potential project because the owner's asking price for the land was almost twice what appraisals indicated the property was worth. The trial court found that the county's communication with LAFCO reflected its support of affordable housing at the Monticello Road sites and that the project was abandoned because the developer could not purchase the property for a reasonable price. The Monticello Road sites were removed from the housing element because Napa Pipe "is a superior site for the development of larger scale affordable housing during the 2007-2014 housing element cycle." The evidence supports the court's finding that this history does not support an inference of discriminatory animus.

Plaintiffs also presented evidence of statements made by two other county officials at an October 14, 2008 joint meeting of the Napa County Board of Supervisors and Planning Commission regarding the draft 2009 housing element update. Planning Commissioner Fiddman stated that he felt the county was complying with state requirements but that he thought more emphasis should be placed on developing low-cost housing in the incorporated urban areas of the county.[24] At the same meeting, Supervisor

---

[24] Planning Commissioner Fiddman stated: "I think we're doing a great job toward meeting state requirements . . . that are needed for us to have a certified housing element, and I realize how important that is. And I certainly would not argue with that being kind of a number one goal here. But I don't think that precludes us from standing back and saying, what should we really be trying to do about housing here in Napa County. . . . [¶] But I would like to see us . . . put a little more emphasis on the strategy of building housing in our urban areas that are already established . . . . And to the extent that we can include some information about what our incorporated cities' housing element plans are . . . and their plans for growth, and show how that starts to meet . . . the real need in this county. I think that would be very helpful, and maybe start presenting our arguments to the county, which from my point of view, we shouldn't really be building any housing in the county, of any quantity at least, and certainly not the affordable housing, and certainly not at the kind of densities that are being talked about today. It should all be built in the cities." Fiddman went on to make additional suggestions such as that the county "ought to have a requirement for any major employers that would build facilities in the county to actually provide some workforce housing. . . . They ought to actually build some housing not just pay an in lieu of fee." He also suggested that the county "ought to have some commentary about the issues we're working on with respect to vacation rentals and fractionalized housing because to the extent that we can prevent having more housing taken out of the actual housing stock, and made virtually resort stock, I think that would be a good thing to do."

Diane Dillon expressed concerns about some of the sites identified for affordable housing in the housing element and felt that emphasis should be placed on developing housing at locations that will reduce greenhouse gas emissions.[25]

The trial court found that Commissioner Fiddman's statement did not establish the county's intent to discriminate against affordable housing. The court explained, "One planning commissioner's communication of a preference for keeping higher-density, affordable housing concentrated in urban areas near public facilities and infrastructure is simply not demonstrative of an overall discriminatory animus against low-income housing or those in need of it. And there is no evidence of any causal connection between the commissioner's statement and the lack of development in the unincorporated areas of the county." We agree that Fiddman's comments do not evidence a discriminatory animus towards affordable housing. Although the court did not specifically address the comments made by other county officials, the same can be said of their statements as well.

Finally, while plaintiffs are apparently correct that no affordable housing has been developed in the unincorporated portions of the county since 2004, that fact does not establish that the failure has been caused by discriminatory policies or practices. The failing unquestionably is a matter of serious concern, but the record indicates that efforts

---

[25] Supervisor Dillon explained, "I understand our legal need to keep some alternative sites [but] I'd like to see something in this document that would reflect that those are places of last resort . . . . [¶] The world has changed since we started our general plan process, and certainly since we did our housing element update. We've got . . . Assembly Bill 32, which mandates that we look at greenhouse gas emissions and roll them back. We've got Senate Bill 375 . . . , which says we're going to look at vehicle miles traveled and greenhouse gas emissions when we evaluate any development." She offered as an example that for Spanish Flat and Moskowite Corner she would "like to see us do something . . . where we said, yes that's appropriate if there is development at Berryessa where we need to have housing up there. Because, in fact, building housing up there would reduce vehicle miles traveled because there are new employees, because there are new resorts and new developments up there." Similarly, she proposed that "housing that's built at Angwin should be tied to worker jobs at Angwin and employees who work in the Angwin area and their need for housing."

to remedy the situation are in fact under way. In all events, the record supports the trial court's finding that plaintiffs failed to establish either a discriminatory effect of county actions or discriminatory animus underlying them. Therefore, we must uphold the court's ruling in the county's favor on plaintiffs' discrimination claims.

## DISPOSITION

The judgment is reversed insofar as it finds in favor of the county on plaintiff's second cause of action to compel the county to comply with the state Density Bonus Law but is affirmed in all other respects. The matter is remanded to the trial court for entry of a writ of mandate consistent with this opinion. The parties shall bear their respective costs on appeal.

_____
Pollak, Acting P.J.

We concur:

_____
Siggins, J.

_____
Jenkins, J.

43

**SIGGINS, J.,** —

I fully concur in the decision of the court. I write separately to express my view that a civil action and subsequent appeal, even with calendar preference, will rarely provide an efficacious remedy to address a deficiency in the general planning process.

Work began to update Napa County's (the county) housing element in January 2008, and it was adopted by the board of supervisors that June. This lawsuit was filed in November 2009. The trial court issued its statement of decision and ruled against plaintiffs on February 1, 2012. The briefing was complete in this court at the end of February 2013. The housing element is to next be revised and updated by June 2015. Thus, we are well into the planning period for the next update.

Against this backdrop, we are to consider whether a challenged plan actually complies in substance with every reasonable objective of the general plan statute. (*Camp v. Board of Supervisors* (1981) 123 Cal.App.3d 334, 348.) If it does not, we may reject it and the county has 120 days to effectuate a compliant plan. (Gov. Code, § 65754.)

In a case like this one where the challengers point to no alternative that would readily fulfill the objectives of the statute, and none is readily apparent in the record, judicial rejection of the plan will only create more uncertainty. Here, I urge the county to carefully consider during this planning period the reservations expressed in Justice Pollak's majority opinion of the feasibility of the selected sites, particularly Napa Pipe.

The Housing Element Law (Gov. Code, § 65580 et seq.) was intended to facilitate and expedite the construction of affordable housing (Gov. Code, § 65582.1). It is hard to discern the fulfillment of that statutory objective when repeatedly the housing envisioned in adopted plans exists only in concept on paper.

_____

Siggins, J.

1



Calistoga

Lake Berryessa

Spanish Flat

Angwin

St. Helena

Moskowite Corner

Yountville

Napa

Napa Pipe

American
Canyon

Napa R.

0          5          10 Miles

NORTH

Priority Housing Development Sites

**FIGURE H-1-1**

**LOCATION OF PRIORITY HOUSING**
**DEVELOPMENT SITES**

COUNTY OF NAPA
HOUSING ELEMENT UPDATE
SITES INVENTORY AND ANALYSIS

Trial court:                          Napa County Superior Court

Trial judge:                          Honorable Raymond Guadagni

Counsel for plaintiffs and appellants:    Relman, Dane & Colfax PLLC
                                      Reed N. Colfax
                                      D. Scott Chang

                                      David Grabill

                                      California Rural Legal Assistance, Inc.
                                      Ilene J. Jacobs

                                      California Affordable Housing Law Project of the
                                      Public Interest Law Project
:                                     Craig Castellanet
                                      Michael Rawson

                                      California Rural Legal Assistance, Inc.
                                      Jeffrey Hoffman

                                      Richard A. Marcantonio and Samuel P. Tepperman-
                                      Gelfant for Public Advocates Inc. as amicus curiae on
                                      behalf of appellants.


Counsel for defendant and respondent:   Goldfarb & Lipman LLP
                                      Juliet E. Cox
                                      Barbara E. Kautz

                                      County Of Napa
                                      Minh C. Tran, County Counsel
                                      Silva Darbinian, Chief Deputy County Counsel

                                      Jennifer B. Henning for California State Association of
                                      Counties as amicus curiae on behalf of respondent.

A135094